132609 Kelli Ann Grabow et al. v. County of Macomb et al., arguments not to exceed fifteen minutes per side. Mr. Desmond for the appellants. Good morning, Your Honors. Christopher Desmond on behalf of the plaintiff appellant. I'd like to reserve three minutes for rebuttal. Judge White, if I may. Your Honors, this case, as you're aware, is a very fact-intensive, deliberate indifference case, and I know you've all read the briefs over extensively, and so I don't want to start off by jumping into a factual recitation, but obviously I'm going to have to incorporate a fair deal of those facts into the argument. So we have a combination here of state law claims and federal claims, each of which were dismissed at the summary judgment stage. I want to begin with the federal claims. There's certainly a tie-over, a spillover from one to the other in terms of the relevant facts, but just to keep it simple, I'll start with the federal claims. Now, the federal deliberate indifference claim involves a showing of two prongs, essentially, an objective element and a subjective element. Now, here, Judge Cone ruled in our favor regarding the objective element, so I don't want to focus on that unless the panel wishes to delve more into that issue. I mean, he said it was a close call. He did. He said, we'll assume for purposes of the analysis that the objective prong has been met. He did. So that doesn't put us in a situation where there would have had to have been a cross-appeal for us to address that. Certainly not. Yeah, certainly not, Your Honor. Now, I think that it's, when you look at the case law involving other jail suicide cases, I think the case law comes down fairly strongly. Every deliberate indifference case that I think the parties have focused on where the plaintiff committed suicide in prison, this court has said that because this particular plaintiff obviously had psychological needs that resulted in a suicide or a suicide attempt, there was an objectively serious medical condition. Now, admittedly, some of the language regarding the objective element refers to this idea of, well, had the plaintiff demonstrated that they had this medical need? I think that's where there's some bleed over into the subjective element, which deals with, you know, were there facts available for you to make the inference, did you make the inference, and did you disregard that knowledge regarding this medical need? Let me ask a question. I understand that we're on summary judgment, so we have to assume that, you know, all inferences are in favor of the plaintiff. But there is an allegation or a statement that, in fact, she was diagnosed with bipolar disorder prior to her incarceration, at least prior to the last incarceration. Correct. Is there any evidence in the record at all indicating either that she was on medication for that or that Ms. Franks was aware of that diagnosis? So she was on medication for that. Ms. Franks was, and this is where the case gets interesting in my mind from an analytical perspective, Ms. Franks, we don't know for sure whether she was aware of that. We know that that evidence was available in Ms. Prochnow's file within the jail system because she had been to the jail frequently before. Was she being administered her medication while she was in the jail? I don't believe she was, no, and I believe that was part of the issue. And with respect to that issue, how should we deal with at least the record evidence that at the time of intake Ms. Franks, who was supposed to do some kind of medical screening or to get information, falsified, filled in the forms rather than eliciting information from the detainee that might have revealed some of this information? Well, right, and that goes to what Judge O'Malley was just asking, whether she was aware of the extent of her severe mental health issues. We're not sure because her defense has essentially become, I closed my eyes so tight that I can't be held liable. I ignored everything that was in front of me. And particularly regardless of any bipolar diagnosis, what we know for a fact, and this came from under Sheriff Medley's deposition testimony, the very computer screen that she was using to falsify the intake form had what he referred to as an active alert that said she is a suicide risk. It said that right on her computer screen. Now, Sheriff Medley was deposed, I believe, after Ms. Franks was deposed. So we didn't ask Ms. Franks, well, did you see that suicide alert? Because we didn't know that existed. But we've since found out, and there's no question, that there was this active alert on the computer screen. Wait, so you're saying that separate and apart from the fact that she didn't go in and search and didn't do the database search to find out whether or not there was a prior alert, you're saying that, I guess because I didn't get this from your brief, you're saying that there was an active alert on the screen at the time that wouldn't have even required her to click on? Right. To be fair, Sheriff Medley, when he starts being asked initially this line of questioning, he says there would have been an active alert on her computer screen. He starts getting asked more, and you can decide for yourself why he would have maybe backed off a little, but I'll defer to the panel's view of the deposition transcripts. When he starts to get asked more, then he says, well, I'm not sure whether she would have had to click through or not. So we do know that there's an active alert in the computer system. Whether that particular screen was up in front of her at the time or not is somewhat unclear. I would submit that, if anything, that becomes a question of fact. So we know that when we're talking about this issue of knowledge and what Ms. Franks knew, we know that she had this active suicide alert on the screen in front of her. We know that she had previously seen Ms. Prochnow. She said she recognized Ms. Prochnow by face. I believe she knew her by name. She said that she had probably served as the intake officer for Ms. Prochnow before. Now, we know that before, when Ms. Prochnow had been taken in, she had been asked this very questionnaire, and we have these questionnaires in the record where she had previously informed jail personnel, yes, I have mental health disorders, yes, I've previously attempted to commit suicide twice, and on at least one occasion in this very jail, she had previously been in a high-observation cell because of her suicide risk. So we have these circumstances before us, and I guess what we could not persuade Judge Kohn on is, what do you do when you have those circumstances? Now, I would say let's look at Farmer v. Brennan, because that's where deliberate indifference really gets recognized by the U.S. Supreme Court for the first time. And in recognizing deliberate indifference, I think that there's, in a way, some sort of cautionary language in Farmer v. Brennan applying the elements of this, in a way, new theory. The court says circumstantial evidence can be used. A plaintiff can prove this aspect of knowledge in all the usual ways. That's what Farmer v. Brennan says, in all the usual ways, including circumstantial evidence. Now, there's significant, at least in my mind, there's significant circumstantial evidence in this case. Now, Ms. Franks may very well want to get up in front of a jury and say, no, I was so deficient that day, and I was so negligent in my actions, or grossly negligent in my actions, that I never looked at that screen, that I never looked at her file, that I cleared my memory of any previous encounters with her. Now, she may say that, and a jury may or may not believe that. I don't think that we should be held to the standard at this stage of needing to essentially have an admission from the very person that we're accusing and the very person that would be held liable. Even if we assume everything that you just said is true, that she, you know, did not do her job, that she was willful and not, that she exercised willful blindness. Yes. Okay. Were there other events that occurred subsequent to this whole intake exercise that may have been intervening factors in the causal connection? I mean, she went to, you know, she had another medical evaluation. She appeared despondent or something at one time. She had a court hearing. Her demeanor changed after she came back from this court hearing. Aren't those things that might be, that might cut or break the causal chain, with respect to Ms. Franks, at least, and what her duty might have been? So, first of all, I would say no. I would say absolutely not. To begin, when you start talking about causal chains and proximate cause, unlike something, say, like duty, causation is a pure question of fact. It's very rare that a trial court should jump in and say, look, the facts here are so deficient that I can judge for myself the issue of causation, and I don't think that this is one of those cases. But to get into the contents of the record, Ms. Pookavan, who is the other intake officer that day, her deposition testimony clearly states that had Ms. Franks asked the questions that she was obligated to ask, if there would have been a yes answer to any one of those questions, which those questions included, have you ever tried to commit suicide? The answer is yes. Are you being treated for mental health issues? The answer is yes. Had she answered yes to any one of those, according to Ms. Pookavan, there were two things that would have happened. Our client would have been immediately referred for a mental health evaluation, and our client would have been placed in a high-observation cell. Now, we know from, I believe it was Michelle Sanborn, who is the jail administrator, we know from her testimony that in, I believe, roughly 30 years, no inmate at Macomb County Jail has ever committed suicide while in a high-observation cell. So, you know, a reasonable trier of fact, could a reasonable trier of fact look at that and say, had you asked these questions, she would not have committed suicide? I believe so. Now, you know, regarding knowledge, again, very quickly, it's interesting to me, and I've been thinking about this, how do you prove knowledge when you don't have an admission? Well, if we take ourselves out of the civil realm and think for a second about criminal law, we do this all the time. With a lot of criminal offenses, there's a mental element to it. You have to have a certain level of intent. We don't know what a defendant's intent is unless a defendant tells us, and rarely do they do that. But we don't take that task away from a jury and say, well, we think he committed this crime because the circumstances in this case indicate he did, but he says he didn't mean to, so I guess we can't charge him, because how can we prove what was in his mind? Instead, we give it to a jury, and we say to a jury, let's look at his actions, and let's try to figure out from his actions, what did he intend or what did he know? Let's look at the circumstances and try to figure out, based on those circumstances, what did he or she intend or know? What we're contending is that in this case, at a minimum, we're at that stage with the type of evidence that we have in this record. We're certainly at the stage where a jury, when you resolve all inferences in our favor, when you view the evidence and the like most favorable to us, that a jury should at least have the opportunity to take a look at this case and decide what Ms. Franks knew. They should be able to look at her on the stand, see her demeanor, assess her credibility, and decide what happened in this case and how Christina Prochnow ended up in a situation where she was able to commit suicide without being observed by the staff of this facility. You confuse me by something. Didn't, what's the name, Pocavan, how do you say it? Pocavan. Pocavan. I believe. You could be wrong. Didn't she ask her whether she ever attempted suicide? Well, she asked her three questions. She asked her, have you ever been in jail before? Then, have you attempted suicide before? And are you currently thinking about harming yourself? According to Ms. Pocavan, she answered no to the suicide question. That's a, it's an admittedly curious part of the record because whether, I've been thinking that perhaps Christina Prochnow was tying that question to the first question. Have you been in jail before and have you tried to commit suicide before? Maybe meaning, have you tried to commit suicide in jail? And maybe that's why she answered no. Because we do know that moments later, or maybe not moments, but within an hour later, when she speaks with Michelle Mason, one of the nurses at the facility, she tells her that she's tried to commit suicide before. So she wasn't trying to hide this from anyone. Well, she told three people that day that she was not currently suicidal, right? Well, I believe she told, she may have told two people that she was not currently suicidal. The third person, I'm assuming, just trying to do the math in my head, I believe would have been the police officer, the arresting officer, who says no statement regarding suicidal ideations. Now, whether he asked her and she denied, or whether that's just she didn't come out and offer any statement, you know what I mean, I'm not sure whether there was an affirmative. Wasn't it more checking no to the question of suicidal ideations? I don't know if he was tasked with asking her that. He may have been, but I'm not certain that that's what the record shows. Even if that is the case, I'm not sure that that's a question that you can rely on an individual to answer accurately, especially when you know that they're bipolar and that they have a suicidal history. You may very well not feel suicidal at that exact moment. Whether she did or she didn't is, quite frankly, unclear. But if that seed is inside of you, if that mental illness is inside of you, just because you don't feel it right now doesn't mean that it's not going to develop in time and that it's not going to develop over the course of days that you're within their care. It's sort of maybe like someone with epilepsy, for example. Are you feeling like you're having a seizure right now? No. But I know I have this condition, and because of this condition, I know that certain steps need to be taken so that I can continue to be in the healthy state that I'm in. So I see my time is up if the panel doesn't have any more questions. Thank you. Thank you. Good morning, Your Honors. Josephine DiLorenzo for defendants. The bottom line here is that Christina did not threaten to harm herself, nor did she appear to be in any kind of distress while she was around Deputy Franks. So she had no serious medical condition to which Deputy Franks could be deliberately indifferent. I think that given plaintiff's arguments, we should remember that the violation of a policy does not necessarily equate to a constitutional violation for deliberate indifference. So plaintiff is focusing on the fact that the form wasn't filled out correctly and that the computer alert wasn't noted. But this doesn't equate to deliberate indifference here. Well, isn't there a question of fact whether she knew, I mean? About the computer alert? Well, the computer alert, if there's testimony that it would have been up there. Well, I think we have to remember that she's an intake officer. So it says this in General Order 504, which is the record entry is 64-2. And their job is to assess immediate problems, immediate mental health and medical problems. So, yes, if Christina had said that she was thinking of harming herself right then, then they could have immediately referred her to the mental health people. But she didn't. But taking your argument to its logical extreme, they could have asked her nothing, right? And as long as they didn't know, then they're fine, right? As long as they keep their head far enough buried in the sand. Well, I think that they realize that suicide is a problem in a jail and that they do need to ask the question. And the question was asked. I think we'd be having... By whom? Oh, by Deputy Poochavon asked her. But that was immediately at the point of intake? That was at the point of intake, yes. So the issue they make is, like, well, Deputy Franks was the one who was supposed to ask the question. And admittedly, she didn't. But the question was asked, and she knew that it was asked. And also the arresting officer had said that he didn't hear her verbalize any thoughts of suicide. So we might be having a different argument if she had committed suicide maybe within the first hour that she was there, before she was seen by the nurse. But that's not what happened. It was on the third day. Now, is the nurse's medical record available to Ms. Franks? Well, the nurse sees the detainees afterwards. And I believe that the next day when Deputy Franks came in, she would know that Christina had been seen by the nurse and that the nurse decided that the problem was detox, that she was withdrawing from drugs. So she was put on a detox protocol and not under suicide observation. But I think... In terms of a history of mental health problems, would those records be available? Well, when she's pulling up her computer screen, I don't believe so. She was supposed to ask, one of the questions she was supposed to ask would be, have you ever been in a mental institution or had psychiatric care? So she could rely maybe on the incoming detainee to tell her that. Can you keep your voice up? I'm sorry. I'm sorry. That doesn't necessarily come up on the screen. And if she was going to get any information from the nurse, it would come maybe the next day. But I think the important thing to remember... When you put the detox protocol on top of mental health problems, doesn't that even heighten the concern more so? Well, that's something that the nurse determines. Deputy Franks is just the intake officer, so she's supposed to assess immediate needs. And then she knows afterwards the nurse is going to assess the detainee. And if something more needs to be done, then the nurse is going to do it. She knew enough to know that a detox protocol was something that required a bed, and she moved her. Yes, that was the next day, correct. At a minimum, have you answered Dr. Malloy's question? Yes. Okay. At a minimum, what did your policy require the first officer to do? You keep saying she asked the question. Okay. Mr. Cullen says that it's like asking someone who's got epilepsy, do you feel like you're about to have a seizure now? And they could say no. Under that circumstance, is the duty to go further obviated by asking that one question, or does it put you on notice or establish an obligation to go further and ask a series of questions? Well, they can also use their powers of observation. And Deputy Franks could see her and see that she looked fine. And Deputy Pucivan also explained that even if Christina had denied feeling suicidal and denied ever attempting to commit suicide, had she looked extremely agitated or was acting erratically, then they could have sent her upstairs to be in close observation. And I think it might help if I explain the different observation levels and why none of them were applicable here. And, again, the record entry is 64-2 if you want to confirm. As you go through that, though, is there something in the policy that tells these people, tells the employees what they're supposed to look for? Because I'm concerned that there might be some type of stereotypical view about how a person with a mental disease or defect is supposed to look. And you said by the visual observation, she looked fine. What are they trained to look for? Well, again, these intake offices are just the first line. So they're not trained to go in depth. That's why they go to see the nurse afterwards. That's the policy. They're screened by the intake officers. So if there's something obvious, then they're going to go upstairs. But otherwise, they're evaluated by the nurse. And it's pretty quickly. I think we said within an hour or so. But high observation is only warranted if the detainee is immediately threatening to harm themselves. There's something called high observation 2, and that's if there was a recent suicide attempt. Now, obviously, they could not be truthful about their recent suicide attempts. But her suicide attempt, it was later determined, was over a year. So this high observation 2 is only if it was in the past year. And I believe hers was more like seven or eight years earlier. So that wasn't going to require high observation 2. And then we have close observation. And that's if they appear to be overly anxious or depressed or acting erratically. So none of those things were present when she first came in, not to the deputies. So otherwise, she only gets a routine. What would have happened if she asked all these questions and she said, yeah, I've been in a mental institution. Yeah, I attempted to commit suicide about seven years ago. No, I'm not contemplating now. It would still be just the routine mental health referral because she didn't have an attempt within the past year, and she wasn't actively threatening. I thought her actual suicide attempt that was not while in custody was only a year before. No. If you look, it's actually an exhibit to plaintiff's brief. In 2010, when she was in the jail, they were asking about her attempts, and one was, I believe, seven years prior and one was 10 years prior. Now, you might be talking about the computer alert that said that she was on suicide watch. So in 2008, during one of her incarcerations, she was placed on suicide watch. So I'm going to assume it's because she was threatening suicide, even if we assume she was attempting it. That's still three years earlier. So she was put under high observation for 25 hours. But after that, she went back into general population. And she was back at the jail three times after that, and she was in general population all of those times. Was she on detox protocol during those times? That's not noted. When we're talking about the computer alerts, there is a page in the jail record where you can see the suicide watch, and then for this last incarceration, it says detox. So I didn't see any other detox on there. The only other alert was in 2010, in November. She was at the jail, and she was pregnant. So there was something on there about how she needed an extra mattress. So that was on that. There was kind of a high incidence of suicides in this jail, was there not? They did say that there were five within a year, and that would go to maybe the claims against the county. But there was no evidence in the record about what a typical amount is, and generally this court requires there to be some kind of evidence to show how they might have deviated from that. And there also wasn't anything in the record about why these suicides occurred. Was it something that an intake officer did by not asking the question or by not filling out the form properly, or was it somewhere farther down the line, like they didn't get the medical attention they needed or they didn't get their medication? This may not be directly related to this issue, but what was the size of the population at the McComb jail at that time? Oh, that I don't know. I'm not sure if that was in the record. It might have been in somebody's deposition testimony, but I'm sorry, I can't tell you off the top of my head. But I think what's important here, again, is that for deliberate indifference, there has to be a serious need that was ignored, and we don't have that here. And again, just a violation of the policy doesn't require or doesn't equate to a constitutional violation. I think one of the cases that I cited in my brief would be sort of helpful, and it was Ellis v. Washington County, Tennessee. In that case, there were several defendants and issues, but the pertinent one is that three weeks prior to the detainee's suicide, before he was in jail, one of the defendant police officers had actually transported him to a mental hospital for an involuntary commitment, and at that time the decedent was threatening suicide. So fast forward three weeks later, the decedent is at the jail, and he's upset and crying and looks agitated, and the officer asks him, are you thinking that you want to harm yourself, and he denies it. So the officer put him in a regular cell and didn't even have him checked out by the nurse, and then the detainee later committed suicide. But this was a district court decision, but it was affirmed by this court, and they found that there was no deliberate indifference because he did not appear likely to commit suicide. And they said the best that they could tell, or the best that the officer could tell, was that he was recently suicidal. Well, that's only three weeks. The only knowledge they would impute to the officer was that he knew that this detainee had been recently suicidal. And that's three weeks. Well, we're talking, on this record, three years because that was the last time she was on suicide watch at the jail. What was that case? The case is Ellis v. Washington County, Tennessee. It's ADF sub second 791. It's cited in my brief. So for all those reasons, I believe the district court should be affirmed. And, I mean, I could run through these other arguments. I guess the only thing I would say on the you brought up the causation element, there definitely was something that broke the chain. Deputy Franks, again, she's just the initial assessment. Afterwards, Christina is seen by a nurse. And then federal law does recognize these intervening causes. And under state law for the gross negligence claims, Michigan is very clear that it has to be the sole approximate cause. And that's definitely not the case here. And there's case law in Michigan that when a detainee commits suicide, they are the one sole approximate cause of the harm. So unless you have any other questions. Thank you. Thank you, Your Honor. Just to clarify a little bit regarding what the tasks were of each of these people and what the roles were of each of these people that are involved in this intake process. This isn't a case where you've got Deputy Pookavan and Deputy Franks both just hanging out at the front of the jail, and either one of them can ask these questions. They're each tasked with asking specific things. Ms. Pookavan had a job to ask three questions. She asked those questions. She did her job. She's not a defendant in this case. Ms. Franks, on the other hand, had an affirmative obligation to ask the questions in a separate form, which was a more thorough form than the three questions that Ms. Pookavan was responsible for asking. There's no dispute that she didn't ask those questions. There's been some playing around with language regarding how to characterize her actions and whether we should say, well, she filled out the form without conducting an interview. But I know if I had to fill out a health form for Judge White right now and say, does your family have a history of diabetes, if I don't ask you that question and I mark yes or no, I falsified it. I have no idea. Ms. Franks was in the same position here regarding Ms. Prochnow. She didn't know the answers to the questions. She chose to answer them anyway. She marked no to all of them, and quite frankly, that was wrong. Regarding Ms. Mason, Ms. Mason, as defense counsel pointed out, was a nurse. Now, she conducted an interview and she asked suicide questions, but the consequence of Christina answering yes to that question to Ms. Mason regarding her suicide history was to get referred for a seven-day mental health evaluation. So within seven days, she had to be seen by a mental health professional. Ms. Pookavan said that as an intake officer, if you get a yes, the consequence is an immediate mental health referral. So these are people that serve different jobs, they have different tasks, and they have different powers. So Ms. Mason coming in doesn't break the causal chain in any way whatsoever. Now, could a jury ascribe or apportion fault to each one of them? Perhaps. But the fact is that the record is very clear here. about whether or not high observation would have been required here or not. If anything, all that does is contradict Ms. Pookavan's clear testimony that if she answers yes to any one of these questions, she has to be put in high observation and she has to be given an immediate mental health referral. I'm sorry, this is Pookavan's testimony. Yeah, Pookavan testified specifically. If Franks asks those questions, which she didn't, and if Christina Procknow answers yes to any one of them, there has to be two things, an immediate mental health referral and high observation. When asked why you had to have high observation, she has a very telling and tragic quote. She says that if you don't put an individual who has that, you know, those suicidal tendencies in high observation, what you're doing is you're giving them every tool that they need to kill themselves. That's exactly what happened here. Okay, so Pookavan was supposed to ask those three questions or she was sort of asking three of the questions that Franks was supposed to ask? No, she was supposed to ask those three questions. She was supposed to ask all six questions? Pookavan was supposed to ask those three. Franks was then supposed to ask five plus some additional questions. Franks wasn't just tasked with asking suicide questions. There were other questions on this intake form relating to general health as well and prior history as well. She omitted all of those questions, but for the purposes of this, the relevant portion is the questions regarding suicide. These two individuals had worked together for a number of years, and they testified that they had taken it upon themselves to develop this system that they referred to as the good-to-go system, where Pookavan would ask her three questions, and if she got no's, she would yell over to Franks, good to go, and Franks would then fill out the rest of her form without asking any questions. They had done this in front of supervisors, which this relates to the Monel issue. They had done this in front of supervisors, and they had never been told that this was wrong. So this form exists for a reason. These layers of protection regarding Ms. Pookavan, Ms. Franks, Ms. Mason, they're there for a reason, and it's because suicide is a serious issue in jails, especially when you have five to seven within one year among people that are not in high-insertion. There's no constitutional requirement to discern that, right? It's only – Well, there's not an independent constitutional requirement, or I'll say this, there's case law that indicates there's not an individual constitutional requirement to screen someone for suicide if you don't know about their suicidal tendencies. Now, I don't know how you can shield yourself with that if this person has been in your facility before on suicide watch, if they've got a suicide alert in their computer saying she is a suicide risk. So I think what that case law essentially is meaning to say, Judge White, I believe, is that you don't necessarily have to ask some stranger off the street that you've never dealt with before, are you suicidal? Maybe the law doesn't require that. But if that person's been before you before, and you've asked that question, and you know the answer is yes, now you've got an obligation to figure out, okay, I know this special aspect of you and your personality and your mental health, so let's sit down now and figure out where you're at at this point. Okay, but now they have these procedures, but they're not constitutionally required. What happens if you have somebody who says, no, I haven't attempted to commit suicide, and I don't feel suicidal? You have to go further? Essentially, that's what was asked, and that's what she answered. That's what was asked by one individual. The other individual asked nothing. And again, I think it depends on the person. Now, if I went in there, God forbid, but if I went in there and they asked me those questions and I said no, they've never met me before, okay, maybe they can pass me up the chain. But if it's someone that you've met before that's been on suicide watch before and that has a suicide alert, maybe you need to say, okay, even if she's telling me she's not suicidal, I know she's bipolar, and I know she's tried to kill herself before, maybe we need to ask her these five questions instead of falsifying her form. The key is subjective. So you don't dispute that she didn't subjectively know because she never asked. I do. I do dispute that. And I think that that's a pure question of fact. And again, it goes back to the analogy I was trying to maybe ineffectively draw between criminal law and civil law and how you figure out someone's mental state. And if she did see that suicide alert, but she said, well, I see the suicide alert, but Pookavon says she's good to go, so I'm going to send her to a normal cell, she knew. If she remembered in my head, oh, yeah, she's been in here before and I think she's been on suicide watch before, she knew. She subjectively knew and she drew that inference. Now, her disregard for that inference is the reason why we're here today and it's the basis of our claim. But I think that that gets converted into a question of fact when you look at the circumstances of these cases. Now, if Ms. Prochnow had gone in there and had no history with them and there was no suicide alert and Ms. Franks falsified this form the way she did here, maybe she'd be able to say, yeah, I screwed up in falsifying the form, but I really didn't know. But we've got those additional facts. We have the suicide alert. We have the previous interactions. Can you show deliberate indifference when it's undisputed that Pookavon told her that she answered no to those two questions? Yeah, we can. We absolutely can. And, again, it comes down to what is in Franks' head separate from, for example, if you say to me right now, you're not wearing a red tie, you can say that to me. But if I know I put on a red tie this morning, your statement to me doesn't eliminate what's in my head. So if Pookavon is saying she's good to go, but Franks is seeing on her computer screen active suicide alert, suicide risk, then I don't think that Franks can simply say, well, Pookavon says it's okay, knowing that she didn't ask. That being on the screen, then, you say comes from this sort of ambiguous testimony from the sheriff. Well, it's not ambiguous in the fact that, I mean, he is as plain as he can be that there is an active suicide alert on the computer screen. What he couldn't say is, was Ms. Franks looking at that particular screen? Was she in that portion of the system? That he couldn't say. And that's why you say that this needs to go to the fact fund to have all this evidence play out. Exactly. How does the Ellis case that your counsel opposite raised, how does that affect your particular case and these facts? Well, you know, Your Honor, I think these are, this is one of those interesting areas of law to me where, yes, previous case law is important. Farmer v. Brennan, very important, because it tells us what kind of evidence we can use. But when you start looking at specific factual circumstances in previous cases, I don't know to what level a future case can be bound by that. But you say this is factually distinguishable. I think it absolutely is. There's no legal holding that ensues from that case that would be determinative of this case. That's correct. At the stage we are now. That's correct. I mean, I don't know if the plaintiff in that case had a clear history of being bipolar and requiring mental health treatment. I know, obviously, based on the genders, he wasn't a new mother like Ms. Prochnow was. And that was one of the questions that was on the form that Ms. Franks ignored. Is there anything notable about your family life right now or your home life? If she would have asked that, she would have been told, yes, I just had a child. That can perhaps interfere with someone's emotional and hormone levels and someone who has prior mental health issues. That can be a complicating factor. Are you referring to the question, do you have unusual home or family problems, or is that a different question? Yeah, that might be it, yeah. So maybe you wouldn't characterize it as a family problem. But if I was asked, basically, do you have something going on at home, which is the way I read the question, maybe that's not entirely what it was. Ms. Franks' job was not to do a medical analysis. So, for instance, if she said, yes, I'm a new mother, and even said, yes, I have a history of some mental health problems, if she said no on the suicide question, she had no obligation to say, okay, a doctor might say, somebody who's postpartum or somebody who's going through detox, that they might be more likely to be suicidal if this person said that they weren't. If she would have said, I'm not currently suicidal, but would have said, yes, I've previously attempted suicide, or yes, I've been treated for psychological disorders, which was, those were other questions Ms. Franks didn't ask. According to Ms. Pookavon, if she says yes to any one of those questions, she has to get an immediate mental health referral and she has to be put in high observation. So even if she would have just denied current suicidal ideations, the fact that she had that history, there's evidence in the record that indicates that that required affirmative action that didn't occur here. Thank you. Thank you. I see the red has been like significantly long, but thank you very much.